# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| WASHINGTON FEDERAL SAVINGS AND LOAN ASSOCIATION, a federal association, | ) ) ) ) | No. 68978-9-I |
| | ) | DIVISION ONE |
| Appellant, | ) ) | |
| v. | ) ) | |
| THE McNAUGHTON GROUP, a Washington limited liability company, and SILVER LAKE WATER AND SEWER DISTRICT, | ) ) ) ) | PUBLISHED OPINION |
| | ) | |
| Respondents. | ) | FILED: February 3, 2014 |

SPEARMAN, A.C.J. — The McNaughton Group, LLC (TMG) entered into agreements with Silver Lake Water and Sewer District (the District) to construct sewer facilities that it would transfer to the District in exchange for the provision of sewer and water services. The sewer facilities were to serve the Sommerwood Property, a residential subdivision being developed by TMG. After the sewer facilities were constructed, TMG conveyed them to the District and TMG received a right to future "latecomers fees" from the District that would reimburse it for the cost of constructing the facilities. Meanwhile, TMG obtained a loan from Horizon Bank that was secured by a deed of trust on the Sommerwood Property. After TMG defaulted, Horizon acquired the property at a foreclosure sale. The sale left

a deficiency on the loan. Washington Federal Savings and Loan Association (Washington Federal) subsequently acquired Horizon's rights related to the Sommerwood Property. Washington Federal filed a declaratory relief action against TMG, asserting that it acquired, under the deed of trust, TMG's right to the latecomers fees. The trial court dismissed Washington Federal's action on summary judgment. The issue on appeal is whether Washington Federal has a claim to the latecomers fees. We conclude that the provisions of the deed of trust on which Washington Federal relies did not grant a security interest in the latecomers fees and affirm.

## FACTS

In 2003, TMG began acquiring real estate in Snohomish County to develop a residential subdivision, the "Sommerwood Property." Clerk's Papers (CP) at 940. To obtain approval of its development plans, TMG had to ensure that sewer facilities would be available to serve the Sommerwood Property and surrounding subdivisions.[1] Accordingly, on April 16, 2003 and July 14, 2006, TMG and the District entered into agreements (Extension Agreements), under which TMG agreed to construct and connect an extension to the District's existing sewer and water system. The extension would consist of a sewer lift station, wet well, and related improvements (collectively, Sewer Facilities). Some of the Sewer Facilities would be on the Sommerwood Property and some would be in the public right-of-way. The Extension Agreements provided that, once the

---

[1] A water and sewer district is empowered by statute to compel every property owner within its boundaries to obtain water and sewer service from it. RCW 57.08.005(9). Under WAC 173-240-104(1), "domestic sewage facilities will not be approved unless ownership and responsibility for operation and maintenance is by a public entity."

Sewer Facilities were constructed, TMG would transfer them to the District under a bill of sale.[2] The tract on which the wet well and lift station would be constructed was to be severed from the Sommerwood Property and dedicated to the District.[3] The Extension Agreements also stated that the District had the discretion to agree to a "latecomers agreement" with TMG. Under a latecomers agreement, TMG would be entitled to recover a portion of the costs of constructing the Sewer Facilities, through connection charges paid to the District by other property owners who subsequently used the facilities. RCW 57.22.020(2).

Meanwhile, in March 2005, TMG obtained a $7 million "Line of Credit" from Horizon Bank. The Line of Credit, which allowed TMG to acquire bare land and to develop plats, was eventually secured by a "Deed of Trust" on the Sommerwood Property.[4] The Deed of Trust was executed on March 15, 2007 and gave Horizon a security interest in:

> all of Grantor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all water, water rights and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters (the "Real Property") located in Snohomish County, State of Washington.

---

[2] Under RCW 57.22.010(3), the connection of an extension to a district's system is conditioned upon the transfer of the extension to the district without cost to the district.

[3] In 2004, the Sommerwood plat received preliminary approval. At that time, the tract on which the sewer lift station was to be built was identified.

[4] TMG had initially granted Horizon a deed of trust on the Bear Creek Highlands plat. But after TMG refinanced Bear Creek through a different lender in 2007, Horizon agreed to substitute the Sommerwood Property as security for the Line of Credit.

CP at 1269. The Deed of Trust provided a legal description of the land comprising the Sommerwood Property. The Deed of Trust also gave a security interest in "all of [TMG's] right, title, and interest in and to all leases, Rents, and profits of the Property," with "Rents" defined as "all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property." CP at 1269. At the time the Deed of Trust was executed, Horizon was not aware of TMG's plans to build the Sewer Facilities. At the time, Horizon valued the Sommerwood Property on an "as is"/raw land basis of $16,820,000. The loan amount for the Line of Credit was increased to $11,700,000 in November 2007.

After the Sewer Facilities were built, TMG conveyed and transferred them to the District under a February 26, 2009 Bill of Sale.[5] The Bill of Sale stated that the Sewer Facilities were "free of all liens or encumbrances." CP at 363. On May 6, 2009, TMG granted the District a permanent site easement over the Sommerwood Property, giving it a perpetual right to enter the land to maintain and operate the Sewer Facilities.

By April 2009, TMG was in default on the loan from Horizon. TMG did not cure the default, and Horizon purchased the Sommerwood Property at a nonjudicial foreclosure sale on September 18, 2009. The Sommerwood Property

---

[5] These Sewer Facilities included: (1) 2,475 lineal feet of 8" HDPE force main; (2) 92 lineal feet of 8" ductile iron pipe; (3) 965 lineal feet of 10" PVC pipe; (4) 68 10" lineal feet of ductile iron pipe; (5) 24 lineal feet of 12" PVC pipe; (6) five 48" manholes; (7) one wet well (a concrete-lined manhole 20 to 30 feet deep in the ground); (8) one lift station; (9) security fencing and gate; (10) generator and fuel tank; and (11) landscaping. Approximately 3,300 lineal feet of the force main and pipes are located within the public right of way. A later Bill of Sale for water improvements associated with the lift station was executed on June 1, 2009.

4

was conveyed to Horizon by Trustee's Deed. The sale left a deficiency of more than $6 million on the loan.

On October 7, 2009, TMG and the District entered into a "latecomers agreement" under which the District would reimburse TMG a portion of the cost of constructing the Sewer Facilities.[6] The payments would come from fees the District would collect from property owners within a defined benefit area at the time they connected to the facilities.

On January 8, 2010, after regulators closed Horizon and named the Federal Deposit Insurance Corporation (FDIC) as the bank's receiver, Washington Federal purchased certain assets of Horizon from the FDIC, including the Line of Credit and all rights related to the Sommerwood Property.

On December 30, 2010, Washington Federal brought a declaratory relief action against TMG and the District, seeking a determination that it was entitled to any payments made by the District under the latecomers agreement.[7] Washington Federal filed a motion for summary judgment, which the trial court denied. Following discovery, the parties cross-moved for summary judgment, agreeing there were no disputed issues of material fact. The trial court granted TMG's motion and denied Washington Federal's, ruling that Washington Federal

---

[6] The District's board of commissioners ratified the Latecomers Agreement in November 2010.

[7] By February 10, 2010, Washington Federal became aware of the Latecomers Agreement and notified the District that it acquired any rights TMG had under such an agreement. TMG continued to assert those rights on its own behalf. On June 18, Washington Federal filed a UCC financing statement that identified "that certain Latecomers Agreement dated October 7, 2009 and all rights to payment arising therefrom, together with proceeds." CP at 675-76.

had no security interest in or claim to the latecomers fees.[8] Washington Federal appeals.

## DISCUSSION

This court reviews summary judgment de novo. Hearst Communications, Inc. v. Seattle Times Co., 154 Wn.2d 493, 501, 115 P.3d 262 (2005). Summary judgment should be granted if the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Id.; CR 56(c).

Security agreements are interpreted like any other contract. Parker Roofing Co. v. Pacific First Fed. Sav. Bank, 59 Wn. App. 151, 155, 796 P.2d 732 (1990). "[T]he intent of the security agreement is interpreted as a matter of law." Id. Courts ascertain the parties' intent by focusing on the "objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties," giving terms their ordinary, usual, and popular meaning unless the agreement clearly demonstrates a contrary intent. Hearst, 154 Wn.2d at 503 (citing, Max L. Wells Trust v. Grand Cent. Sauna & Hot Tub Co. of Seattle, 62 Wn App. 593, 602, 815 P.2d 284 (1991)). A description of collateral is sufficient if it "reasonably identifies" the property. RCW 62A.9A-108(a). The security agreement may identify the property by category, type or "any other

_____

[8] Sometime before the trial court granted TMG's motion for summary judgment, Washington Federal sold the Sommerwood Property to Sommerwood Place, LLC, reserving "any rights to payment related to the latecomer's agreement or Sewer Station." CP at 249-62. Sommerwood Place developed the Sommerwood Property and recorded a final plat in February 2012. In March 2012, Sommerwood Place conveyed to the District, by statutory warranty deed, the tract containing the wet well and lift station.

method, if the identity of the collateral is objectively determinable." RCW 62.9A-108(b)(6).

Washington Federal contends the Deed of Trust granted Horizon a security interest in TMG's right to latecomers fees because they were (1) "proceeds" of "improvements" and "fixtures" on the Sommerwood Property and (2) "rights . . . related to" and "present and future . . . benefits derived from" the Sommerwood Property. CP at 1269. It also contends the latecomers fees were unpaid "profits" under Washington real estate law that passed to Washington Federal. TMG contends the Deed of Trust did not grant a security interest in the latecomers fees because latecomers fees were not reasonably identified as collateral and because neither TMG nor Horizon intended to include them as collateral. The District argues that finding public sewer facilities to be collateral subject to deeds of trust violates public policy considerations and that the Sewer Facilities are not improvements or fixtures.

### Latecomers Fees as Proceeds of Collateral

Washington Federal first contends the latecomers fees are "proceeds" of collateral described in the Deed of Trust. It contends the Sewer Facilities are collateral because they are both "improvements" and "fixtures."[9] Even if we were to agree with this contention, however, the fact that the Sewer Facilities are improvements or fixtures in relation to the land does not necessarily mean they

---

[9] The Deed of Trust defines "improvements" to include "all existing and future improvements . . . ." CP at 1274. The UCC permits this kind of after-acquired collateral clause. RCW 62A.9A-204(a). Thus, although the Sewer Facilities were not completed when the Deed of Trust was signed, if Horizon had a security interest in the Sewer Facilities, it attached upon their completion.

7

are collateral under the Deed of Trust. The Deed of Trust is a security agreement, which is "an agreement between the debtor and the lender that certain property will stand as collateral for the loan." Parker Roofing Co., 59 Wn. App. at 156. Collateral is "[p]roperty that is pledged as security against a debt; the property subject to a security interest[.]" BLACK'S LAW DICTIONARY 297 (9th ed. 2009). Here, TMG contracted with the District in 2003, well before TMG and Horizon executed the Deed of Trust, that the Sewer Facilities would be transferred to the District once they were completed. It makes no sense to say that TMG would or could offer as collateral for the Deed of Trust something it was contractually obligated to convey to a third party upon completion. On February 26, 2009, prior to the foreclosure sale, TMG fulfilled its obligation by formally transferring the Sewer Facilities to the District. Thus, at the time of the foreclosure sale, the Sewer Facilities were owned in their entirety by the District. Thus, they could not have been, and undisputedly were not, conveyed to Horizon under the trustee's deed at the time of the foreclosure sale. It is illogical that property not conveyed pursuant to the foreclosure sale could also, at the same time, be collateral under the Deed of Trust.

Washington Federal takes the untenable position that the Sewer Facilities are collateral in which it has a security interest under the Deed of Trust but that it does not own the Sewer Facilities and would not want to own them. It concedes that it was in its best interest, as the owner of the Sommerwood Property, for the ownership of the Sewer Facilities to reside in the District because such ownership facilitates plat approval and increases the value of the land that is the

subject of the Deed of Trust. Washington Federal's concessions reveal that it could not and would not have been within the contemplation of the contracting parties to the Deed of Trust—TMG and Horizon—for ownership of the Sewer Facilities to reside in anyone other than the District. As both parties recognize, the utility and value of the Sewer Facilities to the landowner can be realized only when the facilities are owned by the District, which is the only entity that can operate them. See WAC 173-240-104(1) (domestic sewage facilities will not be approved unless owned by a public entity). Thus, the contracting parties would not have agreed that the Sewer Facilities would be conveyed to the Deed of Trust grantee rather than the District.[10]

Because we conclude that the Sewer Facilities were not collateral under the Deed of Trust, we do not reach the issue of whether TMG's right to latecomers fees is a "proceed" of the Sewer Facilities.

<u>Latecomers Fees as "Rights Relating To" or<br>"Benefits Derived From" the Sommerwood Property</u>

Washington Federal next contends the latecomers fees are "rights . . . relating to" and "benefits derived from" the Sommerwood Property. CP at 1269.

---

[10] Evidence in the record reveals that the intent of TMG and Horizon was not to make the Sewer Facilities collateral under the Deed of Trust. Horizon loan officer Michael Hall testified that in 2007, at the time the Sommerwood Property was substituted as collateral for Bear Creek, he never discussed including latecomers fees as collateral with TMG's former CFO, Richard Buss, or anyone else at TMG. He testified that at the time the Deed of Trust was recorded, he did not understand it to be secured by latecomers fees. Hall testified that the collateral was the Sommerwood Property in its "as is" condition, as raw land, without giving value to the improvements to the land, such as the rental properties. His testimony is supported by the documents in Horizon's loan file, which value the collateral on an "as is," raw land basis. Mark McNaughton, the manager of TMG and one of its two members, also stated in his declaration that he did not recall any discussions with any representative of Horizon regarding whether the Deed of Trust included a security interest in any potential future reimbursement payments for the cost to construct water or sewer infrastructure for the Sommerwood Property. Significantly, neither Hall's testimony nor McNaughton's is disputed.

The Deed of Trust states that Horizon has a security interest in "all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters . . . ." CP at 1269. The Deed of Trust also includes "all of [TMG's] right, title, and interest in and to all leases, Rents, and profits of the Property," CP at 1269, with "Rents" defined as "all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property." CP at 1275.

Washington Federal contends that the latecomers payments arise exclusively from ownership of the land, noting that only property owners can enter into extension and latecomers agreements under RCW 57.22.010 and RCW 57.22.020. Stated simply, its argument is that without the Sommerwood Property, there would be no latecomers payments.

We disagree. While the right to latecomers fees could not exist absent the construction of the Sewer Facilities, which were built to facilitate the development of the Sommerwood Property, latecomers fees are not "rights relating to" or "benefits derived from" the Sommerwood Property itself. Rather, the latecomers fees relate to and are reimbursement for TMG's costs in constructing the Sewer Facilities, which belong to the District. Moreover, only part of the Sewer Facilities are found on the Sommerwood Property, and the latecomers fees are for reimbursement for construction of the Sewer Facilities as a whole.

Furthermore, a right to latecomers fees reimbursing TMG for its costs in constructing the Sewer Facilities is unlike the other items listed as "rights, royalties, and profits relating to" the Sommerwood Property. Under the doctrine

of ejusdem generis, "specific words or terms modify and restrict the interpretation of general words or terms where both are used in sequence." State v. Reader's Digest Ass'n, Inc., 81 Wn.2d 259, 279, 501 P.2d 290 (1972) (citing, King County Water Dist. No. 68 v. Tax Com'n, 58 Wn.2d 282, 286, 362 P.2d 244 (1961)). "The ejusdem generis rule is generally applied to general and specific words clearly associated in the same sentence in a pattern such as '[specific], [specific], or [general]' or '[general], including [specific] and [specific].'" Southwest Wash. Chapter, Nat'l Elec. Contractors Ass'n v. Pierce County, 100 Wn.2d 109, 116, 667 P.2d 1092 (1983) (alterations in original). (See e.g., State v. Stockton, 97 Wn.2d 528, 530, 647 P.2d 21 (1982)). Here, a right to latecomers fees is unlike rights relating to minerals, oil, gas, and geothermal matters. While these are not the only rights, royalties, and profits that may be subject to the Deed of Trust given the "without limitation" language, we conclude this is further evidence that the future, contingent right to latecomers fees as reimbursement for constructing the Sewer Facilities was not contemplated as security under the Deed of Trust.

<u>Latecomers Fees as Unpaid "Rents and Profits"</u>

Finally, Washington Federal contends that even if Horizon did not have a security interest in TMG's right to latecomers fees, the latecomers fees were unpaid "profits" under real property law. We disagree.

Unpaid rents and profits are considered real property for purposes of a deed of trust. RCW 7.28.230(2) ("Until paid, the rents and profits of real property constitute real property for the purposes of mortgages, trust deeds, or assignments whether or not said rents and profits have accrued."); Kezner v.

11

Landover Corp., 87 Wn. App. 458, 464-65, 942 P.2d 1003 (1997). Thus, where rents and profits are part of the security granted in a deed of trust, the former owner's interest in unpaid rents and profits on the property is "part of the bundle of rights passed to the new owner upon foreclosure." Kezner, 87 Wn. App. at 460. RCW 7.28.230 does not define "profits," so we give the term its ordinary meaning. State v. Gonzalez, 168 Wn.2d 256, 263, 226 P.3d 131 (2010). "Profits" means any "benefit, advantage, or pecuniary gain accruing to the owner or occupant of land from its actual use[.]" Great-West Life & Annuity Assur. Co. v. Parke Imperial Canton, Ltd., 177 B.R. 843, 852 (Bankr.N.D.Ohio 1994) (quoting BLACK'S LAW DICTIONARY 1090 (5th ed. 1979)).

Here, the latecomers fees do not derive from the actual use of the Sommerwood Property and are therefore not "profits." They constitute reimbursement for TMG's costs in constructing the Sewer Facilities.

Affirmed.

WE CONCUR:

_Spearman, A.C.J._

_Dwyer, J._

_Grosse, J._

12